434 A.2d 151

**COMMONWEALTH of Pennsylvania,**

v.

**Robert KNOX, Appellant.**

Superior Court of Pennsylvania.

Argued Dec. 5, 1980.

Filed Aug. 21, 1981.

106

Franchot Golub, Philadelphia, for appellant.

Maxine J. Stotland, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before SPAETH, BROSKY and HOFFMAN, JJ.

SPAETH, Judge:

This is an appeal from a judgment of sentence. Appellant's principal argument is that his trial counsel was ineffective in failing to present an insanity defense. Finding no merit in this argument, or in appellant's other arguments, we affirm.

On June 20, 1975, appellant and two other men committed a series of violent acts against the occupants of an apartment in the building in which appellant lived. In its opinion the lower court described these events as follows:

> On the pretense that Rubenna Coleman had burglarized his apartment, defendant, with his two confederates, invaded her apartment and during the course of several hours, robbed, raped, sodomized and terrorized Ms. Coleman and her luckless guests. These crimes were perpetrated with unusual depravity and brutality: the victims were alternately tied, beaten and terrorized; the two women were sodomized and forced to commit cunnilingus on one another and fellatio on Mr. Chaney. Diane Ruff

was compelled to defecate and Ms. Coleman to eat it and drink from a pail containing regurgitation and feces. Ms. Ruff was scalded with boiling water. Only the dawn brought surcease from the outrage. The police found both women exhausted and severely injured. Ms. Ruff required plastic surgery on her face.

Slip op. at 2–3.[1]

On May 17, 1976, when the case was first listed for trial, appellant failed to appear. A bench warrant was issued but he was not apprehended until September 13, 1976. Slip op. at 10. On April 25, 1977, the trial commenced, before a jury. On May 3, appellant was found guilty on two counts of aggravated assault, two counts of robbery, three counts of involuntary deviate sexual intercourse, and one count each of terroristic threats, criminal conspiracy, unlawful restraint, and possession of an instrument of crime.

■ On May 9, 1977, appellant's trial counsel filed motions in arrest of judgment and for a new trial, alleging only that the verdict was contrary to the evidence, contrary to the weight of the evidence, and contrary to the law. In addition, his motions referred to "[s]uch additional reasons, as counsel may file after the Notes of Testimony have been transcribed." Appellant's counsel subsequently withdrew his appearance and appellant obtained new counsel, who apparently filed additional post-verdict motions, including allegations of ineffectiveness on the part of trial counsel.[2]

1. This is the opinion prepared pursuant to Pa.R.A.P. 1925 and filed on April 10, 1980.

2. These post-verdict motions are not included in the record as transmitted to us. It is apparent from the lower court opinion, however, that appellant's new counsel presented additional post-verdict motions to the lower court. Slip op. at 4, 9, 20–21. The lower court opinion also suggests, however, that two of the issues raised on appeal—the evidence of flight and the hearsay statements—were not briefed or argued to the lower court. Slip op. at 4, 6, 20–21.

Issues must be raised in written post-verdict motions or they are waived. *Commonwealth v. Gravely*, 486 Pa. 194, 404 A.2d 1296 (1979) (rule to apply "to every post-verdict motion which is filed sixty days [from July 6, 1979] and to any motion which is already filed, but which may still be supplemented after sixty days from this

On August 14, 1978, and again on February 1, 1979, the lower court held hearings on appellant's allegations of ineffectiveness of counsel. On December 5, 1979, the lower court denied the post-verdict motions and sentenced appellant. Appellant appeals from this judgment of sentence.

 Appellant's principal argument is that his trial counsel was ineffective in failing to present an insanity defense.[3]

date"); *Commonwealth v. Waters*, 477 Pa. 430, 384 A.2d 234 (1978); *Commonwealth v. Blair*, 460 Pa. 31, 331 A.2d 213 (1975). We have also held that when the record indicates that the issues raised in written post-verdict motions have not been presented by a brief or oral argument to the lower court, they will also be waived and we will not consider them on appeal. *Commonwealth v. Perry*, 279 Pa.Super. 32, 420 A.2d 729 (1980).

However, given the state of the record as transmitted to us and the fact that these proceedings took place before we filed our decision in *Perry*, we shall address all the issues raised by appellant.

3. Appellant also argues that (1) the lower court improperly admitted evidence of flight and improperly charged the jury on this evidence; (2) the lower court should have granted a mistrial when one of the Commonwealth's witnesses gave hearsay evidence concerning the identification of appellant by one of the victims; and (3) his trial counsel was ineffective for failing to file a motion to suppress certain evidence. We can dispose of these contentions rather summarily.

The evidence concerning appellant's failure to appear on May 17, 1976, and his eventual apprehension on September 13, 1976, was admissible as evidence of consciousness of guilt. *Commonwealth v. Whack*, 482 Pa. 137, 393 A.2d 417 (1978); *Commonwealth v. Tinsley*, 465 Pa. 329, 350 A.2d 791 (1976); *Commonwealth v. Osborne*, 433 Pa. 297, 249 A.2d 330 (1969); *Commonwealth v. Rough*, 275 Pa.Super. 50, 418 A.2d 605 (1980). Thus appellant's argument that "[r]eference to the defendant's earlier non-appearance is tantamount to a comment by the trial judge or the Commonwealth [on the] defendant's refusal to testify," Brief for appellant at 11, is simply wrong. Furthermore, the lower court's charge to the jury on this point was fair and did not in any way place undue emphasis on the evidence or suggest to the jury that it should find appellant guilty. N.T. at 758–760. (Unless otherwise noted, all references are to the notes of testimony of the trial in the lower court.)

At trial the officer who arrested appellant referred to a statement by one of the victims, identifying appellant. N.T. at 252. The lower court granted appellant's motion to strike this evidence as hearsay and instructed the jury to disregard the statement. N.T. at 260–261. Since there was a great deal of other evidence identifying appellant as the perpetrator, and since the lower court immediately gave a cautionary instruction, we do not regard the court's refusal to grant a mistrial as error. *See Commonwealth v. Brown*, 444 Pa. 318, 282

Appellant was originally represented by James Crummett, an attorney from the Defender Association of Philadelphia. Sometime in late November 1976, after appellant's flight and apprehension, the lower court received a letter from appellant in which appellant stated that he wished to enter a plea of not guilty by reason of temporary insanity. Slip op. at 10. Mr. Crummett then arranged to have appellant examined by Perry A. Berman, a psychiatrist associated with the Defender Association. On January 7, 1977, Dr. Berman examined appellant for a little over an hour and reviewed the records in the case, including transcripts of testimony in the cases involving appellant's co-defendants. N.T. at 420. On January 12 Dr. Berman reported his findings to Mr. Crummett in a memorandum in which he said in part:

The nature of the crime itself indicates a need for psychiatric evaluation.

 * * * * * *

He and his friend went to that apartment, and when they entered they started threatening the two women, and one of the men that were there. Someone threw lye on his friend and that caused both of these men to go berserk. At that point the co-defendant and this defendant started a series of what obviously seemed like crazy acts. I will not go into reporting them here, but from the description I have been given the entire episode sounds like a loss of touch with reality and a relatively psychotic state.

A.2d 364 (1971). *Commonwealth v. Walley*, 262 Pa.Super. 496, 396 A.2d 1280 (1978).

Finally, appellant's trial counsel was not ineffective in failing to file a motion to suppress evidence. At a hearing before the trial began appellant repeatedly and clearly stated that he did not wish his attorney to file a motion to suppress. N.T. at 7, 18, 20, 22–25. The lower court engaged in a thorough colloquy with appellant in order to explore the possible merits of such a motion and to establish appellant's understanding of what he was giving up. The lower court's finding that appellant made a voluntary and intelligent waiver of his right to file a motion to suppress is fully supported by the record of this hearing. N.T. at 4–27; slip op. at 19–20.

I am not presenting any further findings because I wish to discuss the case directly before further interviewing this man.

*RECOMMENDATIONS*: The usual insanity defense does not apply to this case. There does seem to have been a momentary period of insanity, and I am certain that the District Attorney would simply label that anger. I would label it anger, with loss of contact in reality. However, there is no evidence of continuing mental illness in this defendant.

In a memorandum dated January 24, 1977, Mr. Crummett requested from Dr. Berman "a total background work-up and full psychiatric profile with an aim towards preventing an insanity (temporary or otherwise) defense." Dr. Berman did not, however, examine appellant again.

On March 23, 1977, the lower court allowed Mr. Crummett to withdraw as appellant's attorney and appointed John Poserina to represent him. On Monday, April 25, 1977, the case was called for trial. Before the trial started the lower court judge showed Mr. Poserina a copy of the November 1976 letter, in which appellant had expressed his intention to present an insanity defense. N.T. at 31, 35. Mr. Poserina responded that this was the first time he was aware of a possible insanity defense, and stated that he had not arranged for a psychiatric examination of his client. N.T. at 36. After being informed that Dr. Berman had previously examined appellant, Mr. Poserina requested leave of the court to "try to find out within the next day or two whether Dr. Berman has any information that would be helpful." N.T. at 40. The following day, Tuesday, April 26, the jury was sworn and testimony by the witnesses for the prosecution commenced. Testimony continued on April 27 and the morning of April 28. On the afternoon of April 28 Dr. Berman testified out of the hearing of the jury about his initial examination and diagnosis of appellant. After his testimony, the lower court stated several times its intention to give Dr. Berman enough time to review all the information available on the case—the notes of testimony in the

cases so far, appellant's confession and November 1976 letter to the court, and the report on a psychiatric examination made two weeks after the offenses were committed—so that Dr. Berman would be able to give a more complete opinion. N.T. at 471, 476–477, 478, 480, 486–488. Dr. Berman stated that he would need to speak with appellant at least briefly again, and the court told him to do so. N.T. at 484–485. Finally, the court told Dr. Berman to take the weekend to review all this information and to try to be prepared to testify more fully on the following Monday or Tuesday. N.T. at 482–483.

On the following day, Friday, April 29, Mr. Poserina informed the lower court that Dr. Berman was going to take the time allowed by the court:

Well, the doctor indicated to me that he thought as of the present moment that he would need to spend part of the weekend by going to the prison and reinterviewing the defendant and also spend substantial amounts of time reviewing notes of testimony from former trials, together with information recently supplied to him by the District Attorney's office.

N.T. at 501–502.

At the beginning of the Monday, May 2, trial session the following interchange occurred in chambers and out of the presence of the jury:

MR. POSERINA: We recessed the court on Friday afternoon and I have been in constant communication with the psychiatrist, Dr. Perry Berman, and after consulting with him both on Saturday and Sunday over the weekend, he has explained to me how he has reviewed all of the documents which are now available to him, including defendant's conversation or defendant's confession, the defendant's letter to the Judge as well as the notes of testimony of all the eyewitnesses to the incidents and based upon his review of those records, he has explained to me that he did not feel as though he could give me a positive statement that the defendant was insane as of the time he committed the acts.

THE COURT: Do you want to amplify?

DISTRICT ATTORNEY: No. In terms of insanity, does that also include temporary insanity?

MR. POSERINA: The doctor further informed me that as of the present state of the Pennsylvania law, that he did not think that defendant's conduct would measure up to the *McNaughton* [sic] test. However, if there were some other test ultimately adopted by the Supreme Court, perhaps his erratic behavior would measure up to a new standard. He's not going to determine that at this time. N.T. at 505–506.

Consequently, appellant presented no insanity defense.

■ It might appear that appellant's first attorney, Mr. Crummett, was ineffective because of his failure to transmit to Mr. Poserina the documents and other information necessary to the preparation of an insanity defense. On the day the case was called for trial, Monday, April 25, Mr. Poserina had apparently not yet seen a copy of appellant's November 1976 letter to the lower court, nor was he even aware that appellant had previously expressed any interest in presenting an insanity defense. In addition, he had not seen Dr. Berman's January 12 memorandum to Mr. Crummett, and apparently did not even know that appellant had ever been examined by the psychiatrist. If the lower court had not given Mr. Poserina more time to get in touch with Dr. Berman and to gather the other necessary information, there might be some merit to the claim that there was ineffectiveness here. However, it is clear from the record that the lower court allowed ample time to correct any problems created by Mr. Crummett's failure to communicate fully with Mr. Poserina and to investigate the insanity defense. Furthermore, the lower court actively facilitated the gathering of information. On Monday the court stated on the record an intention to telephone Mr. Crummett to see what information he had in his file. N.T. at 45. When it became apparent at the Thursday, April 29, hearing that neither Dr. Berman nor Mr. Poserina had a copy of Dr. Berman's January 12 memorandum concerning his examina-

tion of appellant, the lower court arranged to have a copy delivered by the Public Defender's office. N.T. at 437–438, 455. Finally, the lower court made certain that Dr. Berman had all the records necessary to prepare his opinion, and allowed both Dr. Berman and Mr. Poserina several days to prepare and confer.

In these circumstances, we do not consider Mr. Crummett's failure to communicate with Mr. Poserina to rise to the level of ineffectiveness of counsel. We do not mean to suggest that we condone the failure—we do not—but here the point is that the lower court quite properly gave Mr. Poserina time to correct the problem created by it, with the result that appellant's defense was not prejudiced.

■ As we mentioned above, the lower court held two evidentiary hearings on the issue of counsel's effectiveness.

The first hearing was on August 14, 1978. Appellant's trial counsel, Mr. Poserina, testified that he had decided not to present any testimony by Dr. Berman because the doctor—after spending time on the weekend going over the records of the case—had told him that he could not give testimony that would support an insanity defense. N.T. (8/14/78) at 48–52. Mr. Poserina stated that Dr. Berman had not indicated to him in any way that he needed more information, or more time, or did not feel capable of making an adequate diagnosis. N.T. (8/14/78) at 54–55, 72–73. Asked whether he had requested a continuance so that he could prepare more adequately for a psychiatric defense, Mr. Poserina replied:

No. My best judgment is that I believed what Dr. Berman told me, that he couldn't give me a defense. I had no reason to believe that anybody else could give me a better one. I just didn't know whether or not another psychiatrist could give me a second point of view.

N.T. (8/14/78) at 71.

The second hearing was on February 1, 1979. Dr. Berman confirmed the testimony Mr. Poserina had given at the first hearing:

Q. Did you not in fact after the April [2]8 hearing have an opportunity to examine all of the notes of testimony regarding this matter up unto that point?

A. As far as I know.

Q. All right. And you had that entire weekend, from that Thursday or Friday until the following Monday, to review that information; is that correct?

A. Yes, as far as I recall.

Q. Now, based on all of that information that you had, minus the knowledge that this confession was alleged to be given under duress, is it a fair reflection to say, as Mr. Poserina stated on the record on Monday, May 2, that he had been in communication with you; and after consulting with you on both Saturday and Sunday over the weekend, you explained to him that you had reviewed all of the documents available to him, including the defendant's conversation or the defendant's confession, the defendant's letter to the Judge, as well as notes of testimony of all eyewitnesses to the incident; and based on that review of those records, you explained to Mr. Poserina that you did not feel as though you could give a positive statement that the defendant was insane as of the time he committed the acts? Is that a fair statement?

A. I think it is.

Q. All right. That's what Mr. Poserina testified to.

Now, would it also be fair that you told Mr. Poserina that you could—that he could inform the Court that as of the present State of Pennsylvania law, you did not think that the defendant's conduct would measure up to the McNaughton [sic] Test? Is that a fair statement?

A. It was. I don't recall if I put it in quite that exact wording.

N.T. (2/1/79) at 32–33.

Dr. Berman did indicate that he believed that he might have been wrong in his opinion that an insanity defense could not be presented. He did not state that his opinion *was* wrong. Rather he said that he should have taken more

time and obtained more information before forming his opinion:

Q. Doctor, do you feel that in order for you to have testified in this matter with a more definite degree of certainty and positiveness one way or the other, that you should have had a more lengthy examination and conducted an examination more than one time regarding this defendant?

A. I think a lot more examination, more material and certainly more discussion with the attorney would have been useful.

Q. In your professional opinion, if you were going to testify at a trial regarding a man's insanity or sanity, should more interviews, then—this is just another way I guess of asking the question—should more interviews and more examinations have been conducted with this particular person or any person to determine the issue with any degree of certainty?

A. It would have been helpful to have more interviews. What would have been useful would have been a number of things that are missing in this case. I mean now missing—referring to documents that I don't have.

Q. So in other words, if any doctor was going to testify in a case of insanity, shouldn't that doctor conduct extensive interviews with an individual to determine with a great deal of certainty whether or not that man is insane? In other words, isn't it in your professional opinion that a man should be examined for more than one hour if this is going to be the defense in court. . .

MRS. FOULKES: Objection.

Q. to make that an adequate examination.

MRS. FOULKES: Objection.

THE COURT: I will permit the question.

A. Yes, generally speaking.

MR. SMALL: All right. I have no further questions.

THE COURT: Therefore, you could not have formed any opinion with any medical certainty from the brief interview that you had with the defendant and by examination

of the record that was presented to you by the court? Am I correct?

MR. SMALL: Objection.

THE COURT: Well, your objection is noted.

Therefore, you could not have formulated an opinion with medical certainty that this man's faculties were so impaired that he didn't know right from wrong at the time that he committed these act? Is that right?

THE WITNESS: In this particular case I would agree it is right. It is not always so.

N.T. (2/1/79) at 46–48.

As we read the testimony at the two evidentiary hearings, it comes down to this: Dr. Berman, an experienced defense psychiatrist, told appellant's counsel that on the basis of several days' review, both of his previous interview with appellant and of all the documents and records in the case, he could not give any testimony that would support an insanity defense. Dr. Berman did not say to counsel that he was giving a qualified or tentative opinion; he did not express any need for more time or information. On the basis of this information, appellant's counsel decided that it would be useless to present Dr. Berman's testimony, and that he would be unlikely to get any more favorable testimony from another psychiatrist.

In these circumstances, we are unable to say that counsel's decision was uninformed or without any reasonable basis. It is true that Dr. Berman *subsequently* decided that he should not have given his opinion without more information. He may be correct. However, the issue before us is the effectiveness *of counsel,* not the effectiveness of an expert witness. After consulting an experienced and qualified expert, who gave an opinion without expressing any reservations, appellant's counsel made a reasonable determination that the expert's testimony would be useless in establishing an insanity defense. We shall not allow our analysis of the effectiveness of counsel to be changed by an expert wit-

ness's hindsight opinion that he should not have expressed any opinion in the first place.

Affirmed.